IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>THOMAS JOSHUA FERRY,<br><br>　　　　　　　　Defendant. | ORDER AND MEMORANDUM DECISION<br><br><br><br>Case No. 2:05 CR 921 |

　　　　While searching a residence under the authority of a search warrant, law enforcement officers seized a secured black lock box from the bedroom of Defendant Thomas Ferry.  After leaving the residence, the officers placed the box in the evidence room of the police station.  Several hours later, after obtaining information indicating that there might be a gun in the seized box, officers retrieved the box from the evidence room, forced the box open, and discovered a handgun.

　　　　Following the discovery of the handgun, Mr. Ferry was charged with knowingly possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  He moves to suppress the introduction of the gun into evidence, arguing that the officers executing the search warrant had no authority to seize the lock box in which the gun was found.  The court agrees and concludes that the officers exceeded the scope of the warrant when they seized the lock box

without having any knowledge of its contents and when opening the box at the residence would not have been unduly burdensome.

## Facts

After receiving a complaint about possible counterfeiting activity, Detective Jeff Johnson began an investigation. (See Transcript of June 15, 2006 evidentiary hearing ("Tr.") 7-8.) As Detective Johnson gathered evidence, the scope of the investigation expanded to encompass allegations of car theft and firearms possession. (See id. at 7-8.) Mr. Ferry soon became the primary target of the investigation. (See id.)

As part of the investigation, Detective Johnson prepared an affidavit in support of a search warrant covering Mr. Ferry's residence. (See id. at 7, 9.) Detective Johnson presented the affidavit to a state court judge, who issued the requested warrant. (See id. at 9.) The search warrant authorized police to search for eight groups of items including: electronic devices and tools for making counterfeit money, illegal narcotics and paraphernalia, firearms and bullets, car keys, a wallet, and "any other fruits and/or instrumentalities determined to be evidence of the crimes of vehicle burglaries, stolen vehicles, theft, illegal narcotics, firearms, counterfeiting, money and theft by receiving." (Plf.'s Ex. 1.)

Detective Johnson and his team served the no-knock search warrant at approximately 5:00 a.m. (Tr. at 11.) Several S.W.A.T. teams were assigned to secure the residence so that Detective Johnson and seven other law enforcement officials could search the house. (See id. at 11, 35-36.) During the initial entry by the S.W.A.T. teams, locked closets were pried open, likely with claw hammers. (See id. at 41-42.) Approximately forty to fifty officers were initially on the scene to execute the warrant. (See id. at 35.)

Mr. Ferry was not at home when the warrant was executed. (Id.. at 12.) But Mr. Ferry's parents and siblings were present. (See id.) Detective Johnson asked Mr. Ferry's brother, Tymone, if he knew whether Mr. Ferry possessed a gun. (Id. at 14.) In response, Tymone indicated that Mr. Ferry had a gun similar to the one Detective Johnson carried, although Tymone stated that he had not seen the gun recently. (See id. at 15.) Tymone was unable to tell Detective Johnson where the firearm was located, stating only that he believed Mr. Ferry kept the gun in his room. (See id. at 15.) Jered McDonald, who was also at the home when the warrant was served, told Detective Johnson that Mr. Ferry kept a black handgun in his bedroom. (Id. at 16.)

Fairly early on in the search of the residence, officers found ammunition and a clip to a gun on top of a television located in Mr. Ferry's room. (Id. at 20.) The ammunition corresponded to the type of gun described by Tymone. (See id. at 20.) Officers also discovered a gray box, a blue box or cooler, and a small black lock box, all of which were found in Mr. Ferry's room. (Id. at 13, 21.) The gray and blue boxes were already unlocked and open when found by the officers . (Id. at 45.) Both contained numerous keys, objects that were expressly identified in the search warrant. (Id. at 21; Plf.'s Ex. 1.) Officers seized the gray and blue boxes. (Tr. at 22.)

The black box presented officers with a more difficult challenge because the box was locked. (See id. at 23.) Officers asked others in the house if they knew where Mr. Ferry kept the key to the box but no one did. (Id. at 24.) At that point, officers apparently abandoned the idea of opening the box at the home. (See id. at 23.)

Approximately a half hour into the search, and a short time after officers discovered the black box, Detective Johnson received notification that Mr. Ferry had been located. (Id. at 19.)

Detective Johnson went to the location where Mr. Ferry and his girlfriend, Candice Hernandez, had been detained by officers and, with the help of Detective Chuck Tolman, took Mr. Ferry and Ms. Hernandez to the police station. (Id. at 25.) Approximately an hour after taking custody of Mr. Ferry and Ms. Hernandez, Detective Johnson started to interview Mr. Ferry and Ms. Hernandez in separate rooms, with Detective Johnson moving back and forth from one room to the other. (Id. at 26, 48.) Both Mr. Ferry and Ms. Hernandez denied any knowledge of illegal activity. (Id. at 26-27.) After conducting the separate interviews for about a half hour, the officers allowed Mr. Ferry and Ms. Hernandez to speak to each other. (Id. at 28.) Officers monitored the conversation. (Id.)

During the conversation, Mr. Ferry told Ms. Hernandez that he had a gun, which he stored in a black box in his room. (Id. at 29.) At that point in time, unbeknownst to Detective Johnson, officers had already seized the black box found in Mr. Ferry's room and had placed the box in the evidence room at the police station. (See id. at 51-52.) After hearing Mr. Ferry mention the black box, Detective Johnson attempted to ascertain whether the search team had seized the black box that had been found in Mr. Ferry's room. (See id. at 52.) It was at that time that Detective Johnson first learned that the box had been seized. (See id. ("[T]hat . . . is where I gained my knowledge that we had that box.").)

Detective Johnson contacted the evidence technician and had the black box pulled out of evidence. (See id. at 31.) Detective Johnson, using a set of pliers and a screwdriver, forced the box open. (See id.) It took Detective Johnson "mere seconds" to open the box. (Id. at 31, 46.) Detective Johnson found a black handgun inside the box. (Id. at 32.)

## Analysis

Mr. Ferry argues that the handgun must be suppressed because the search warrant did not authorize the seizure of the black box. The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched the persons or things to be seized." U.S. Const. Amend. IV. "[T]he warrant must leave nothing to the officer's discretion as to what is to be seized, so that the officer is prevented from generally rummaging through a person's belongings." United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997) (citing Lawnmaster v. Ward, 125 F.3d 1341, 1347-48 (10th Cir. 1997)).

In Hargus, the Tenth Circuit reaffirmed the well-established rule that "officers' conduct in executing a search warrant is governed by the Fourth Amendment's mandate of reasonableness from the moment they step into the house until the moment they leave." Id. (citing Lawnmaster, 125 F.3d at 1348-49). If evidence is obtained in violation of the Fourth Amendment, "only the improperly seized evidence . . . must be suppressed, unless there was a flagrant disregard for the terms of the warrant." United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 875 (10th Cir. 1992) (internal quotation omitted)).

Mr. Ferry does not allege that officers conducted the search of his residence with a flagrant disregard for the scope of the search warrant. Rather, he claims that the officers exceeded the scope of the warrant by seizing and removing from the residence an item that was not identified within the warrant; namely, the black box. Mr. Ferry argues that suppression is especially warranted in this case because officers seized the black box even though they were unaware of its contents and despite the fact that the box could have been opened at the residence.

The United States responds that the language of the warrant did authorize the seizure of the black box because the warrant allowed officers to seize items that may conceal evidence of a crime. Even if the seizure was not expressly authorized by the warrant, the United States contends that the seizure was reasonable under the circumstances and, therefore, did not violate the Fourth Amendment.

**I.      The Express Language of the Warrant Did Not Authorize Seizure of the Black Box**

The United States argues that the language of the warrant authorized the seizure of the black box because it was possible that the box was being used to conceal evidence of a crime. In support of this assertion, the United States relies on two separate provisions of the search warrant. First, the United States points to the "catch all" provision of the warrant, which authorized officers to search for "[a]ny other fruits and/or instrumentalities determined to be evidence of the crimes of Vehicle Burglaries, Stolen Vehicles, Theft, Illegal Narcotics, Firearms, Counterfeiting Money and Theft by Receiving." (Plf.'s Ex. 1.) Second, the United States refers to an express finding in the search warrant that the specific items of evidence identified in the warrant, including evidence covered by the catch-all paragraph, "[have] been used to commit or conceal a public offense, or [are] being possessed with the purpose to use . . . as a means of committing or concealing a public offense." (<u>Id.</u>) According to the United States, those two provisions of the search warrant, when read in conjunction, provided officers the authority to seize the lock box, which was possibly being used to conceal evidence of a crime.

The United States's argument overlooks the fact that the operative scope of the language in the warrant that discusses concealment is constrained by the warrant's initial identification of items of evidence for which officers were entitled to search. The judge issuing the warrant did not authorize the seizure of any item that might conceal evidence. Rather the judge determined

that the specific types of <u>evidence</u> identified in the warrant had been used to commit or conceal a crime.  Therefore, for the United States to rely on the possibility that the black box was being used to conceal a crime, the United States is first obligated to establish that the black box itself, as opposed to the contents of that box, was evidence relating to one of the crimes identified in the warrant.  The United States has failed to make that showing.  Accordingly, the United States cannot rely on the express language of the search warrant in its attempt to justify the seizure of the black box.

## II.     Seizure of the Black Box Was Not Allowed Under the Circumstances

The United States contends that, even if the warrant did not expressly authorize the seizure of the black box, the seizure was nevertheless reasonable under the circumstances and did not violate the Fourth Amendment.  The United States finds some comfort in case law that allows officers executing a search warrant to search locked containers that plausibly contain evidence identified in the search warrant.  <u>See, e.g.</u>, <u>United States v. Ross</u>, 456 U.S. 798, 820-21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.  Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found." (footnote omitted)); <u>United States v. Snow</u>, 919 F.2d 1458, 1461 (10th Cir. 1990) ("The locked safe was a likely source for the specified documents and could therefore be opened.").

Mr. Ferry concedes that officers were authorized to force open the black box while executing the warrant.  But Mr. Ferry argues that the officers had no right to seize the black box and search it at a later time.  As noted by the First Circuit, there is no clear answer to the question

7

of "whether and when the police may seize and remove from the premises items that are not named in the warrant merely in the reasonable hope that a search of those items later on will lead to recovery of the items that are named." United States v. Upham, 168 F.3d 532, 536 (1st Cir. 1999). In this case, the weight of authority indicates that the seizure of the black box was inappropriate.

In arguing for the contrary result, the United States relies primarily on Hargus. In Hargus, the Tenth Circuit upheld the wholesale seizure of two filing cabinets by officers who were searching a residence under the authority of a warrant. 128 F.3d at 1363. The warrant authorized the seizure of "ten broad categories of records," including records relating to the purchase and sale of oil. Id. at 1362-63. Before seizing the filing cabinets, the officers "confirm[ed] that oil records were present in every drawer of the file cabinets." Id. at 1363. Even though the filing cabinets contained numerous items that were not expressly covered by the warrant, the officers justified the wholesale seizure of the filing cabinets on the ground that sorting through the voluminous records at the residence would be impractical. Id. Although the Tenth Circuit expressed concern about the seizure, it concluded that "the officer's conduct did not grossly exceed the scope of the warrant. Their conduct was motivated by the impracticability of on-site sorting and the time constraints of executing a daytime search warrant." Id.

The present case is distinguishable from Hargus. Importantly, the officers in Hargus confirmed that the filing cabinets contained evidence identified in the warrant before seizing the filing cabinets. Here, the officers did not have any knowledge concerning the contents of the lock box at the time it was seized. (See Tr. at 23 ("We felt it was easier to take this box, put it

into a controlled atmosphere, into our evidence room, and continue with it at that point once we realized what we had or what we needed to do.").)[1]

Also, the degree of impracticability faced by the officers in this case pales in comparison to the task confronted by the officers in Hargus. In Hargus, the officers avoided the arduous and time-consuming task of sorting through the contents of two filing cabinets at the site of the search by effecting the seizure of the filing cabinets. The task of the officers in this case was neither as difficult nor as time consuming. Detective Johnson testified that the officers did not open the black box on site because they lacked the tools necessary to force the box open. According to Detective Johnson, it would have taken approximately one hour to send one of the officers at the residence to retrieve the necessary tools. But Detective Johnson also testified that the black box was discovered within the first half hour of the search and further indicated that the entire search lasted approximately three hours. Accordingly, sending an officer to retrieve tools necessary to open the black box would not have unduly prolonged the time that the officers were at the residence. Further, Detective Johnson testified that when the officers did decide to open the black box at the police station, it took only seconds to force the box open with a screwdriver and a set of pliers.

In short, Hargus involved a situation where officers avoided a laborious on-site sorting process by seizing items that were known to contain evidence identified in a warrant. The

---

[1] Although Detective Johnson offered testimony about the motivations underlying the seizure of the black box, the court notes that Detective Johnson was not present at the residence when the black box was seized and removed from the home. His testimony established that, although he was present when the black box was initially discovered, he left the residence after he learned that Mr. Ferry had been located. At the time he left, the search was still underway. When Detective Johnson learned that Mr. Ferry possibly kept a gun in a black box in his bedroom, it was necessary for Detective Johnson to discover whether the black box had, in fact, been seized. Accordingly, the probative value of Detective Johnson's testimony concerning the underlying motivations for the seizure of the black box is in some doubt.

present case involves a situation where officers seized an item without knowing whether any of its contents were covered by the warrant and where the seizure did not meaningfully reduce the time spent at the residence being searched. Hargus simply does not support the proposition that the seizure of the lock box was permissible.

This case is more similar to that of United States v. Robbins, 21 F.3d 297 (8th Cir. 1994). In Robbins, the Eighth Circuit upheld the suppression of two notes discovered in the defendant's wallet. Id. at 301. The United States argued that suppression of the notes was improper, arguing "that because the warrant authorized officers to search inside the wallet, it also authorized them to seize the wallet." Id. at 300 (emphasis in original). According to the Eighth Circuit, the United States's argument evidenced "a fundamental misapprehension of Fourth Amendment law." Id. The court went on to state the officers had no "authority to seize the wallet because the wallet itself was not an item described in the search warrant." Id. The court explained the outcome as follows:

> That items described in the warrant were ultimately found in the wallet does not justify the initial seizure. A search warrant does not give police license to seize personal property not described in the warrant on the ground that such property might contain items that the warrant does describe; it only allows police to search such property at the place where the warrant is being executed if the property legitimately might contain the [items] specified in the warrant, and then to seize the described items they find inside or, under certain circumstances, the property itself once it is found to contain described items.

Id. (internal quotation, citation, and footnote omitted) (final emphasis added). Although the task of searching Mr. Robbins's wallet while executing the search warrant was substantially easier than the task of searching the lock box in this case, the Fourth Amendment principle remains the same: seizure of items not identified in a search warrant is not allowed simply because later review of the seized item may uncover evidence that is described in the warrant.

The black box was not described in the search warrant as an item that officers were authorized to seize. Despite that fact, the officers seized the black box without any knowledge that it contained evidence that was identified in the search warrant. Further, the officers seized the black box even though opening the box at the residence would not have been meaningfully burdensome or otherwise unduly extended the length of time the officers were at the residence. Under the circumstances, seizure of the black box was inappropriate, and its contents must be suppressed as the fruit of an impermissible seizure.

## Conclusion

Seizure of the black box was not authorized by the express language of the search warrant. Additionally, officers were not allowed to seize the black box with the intent to perform a search of that box at a later time. At the time of the seizure, the officers had no knowledge that the black box contained items identified in the search warrant and searching the black box during the execution of the search warrant would not have been unduly burdensome. Accordingly, Mr. Ferry's Motion to Suppress Evidence (dkt. #15) is GRANTED.

DATED this 25th day of September, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge